# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **DONNA CHRASTECKY AND** | § | |
| **MICHAEL CHRASTECKY,** | § | |
| *Plaintiffs* | § | |
| | § | **Case No.  A-19-CV-1240-LY-SH** |
| **v.** | § | |
| | § | |
| **C. R. BARD, INC.,** | § | |
| *Defendant* | § | |

## <u>ORDER</u>

Before this Court are Defendant's Motions to Limit or Exclude Certain Opinions and Testimony of Dr. Bruce Rosenzweig, M.D. (Dkt. No. 75), Joe Gonzales, M.D. (Dkt. No. 77), and Kenneth McCoin, Ph.D. (Dkt. No. 79), and Defendant's Motion to Exclude or Limit Certain General and Specific Opinions and Testimony of Ahmed El-Ghannam, Ph.D. (Dkt. No. 81), all filed on August 15, 2019 (collectively, the "Motions to Exclude"), along with the associated response and reply briefs.

On January 22, 2020, the District Court referred all pending and future non-dispositive motions in this case to the undersigned for resolution pursuant to 28 U.S.C. § 636(b)(1)(A), Federal Rule of Civil Procedure 72, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. The District Court also referred all pending and future dispositive motions to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.[1]

---

[1] The Court will address Defendant's Motion for Summary Judgment (Dkt. No. 69) in a separate Report and Recommendation.

# I.   BACKGROUND

## A.  The Underlying MDL

This product liability lawsuit resides in one of seven multidistrict litigations ("MDLs") involving the use of transvaginal surgical mesh to treat pelvic organ prolapse and stress urinary incontinence. The Judicial Panel on Multidistrict Litigation assigned 100,000 of these MDL cases to the Honorable Joseph R. Goodwin, United States District Judge for the U.S. District Court for the Southern District of West Virginia, Charleston Division. Dkt. No. 102. Approximately 14,000 of these cases were filed against C. R. Bard, Inc., one of the manufacturers of transvaginal surgical mesh. *See In Re: C. R. Bard, Inc., Pelvic Repair System Products Liability Litigation*, No. 2:10-CV-2187, MDL 2187 (S.D. W. Va.) (the "Bard MDL").

To manage the Bard MDL efficiently and effectively, Judge Goodwin conducted pretrial discovery and motions practice on an individualized basis. He selected approximately 300 of the Bard cases to become part of a "wave" of cases to be prepared for trial and applied to them the same scheduling deadlines, limitations on discovery, and rules regarding motion practice. *See* Pretrial Order No. 244 in Bard MDL. Judge Goodwin has ruled on a plethora of *Daubert* motions filed by the parties, some of which are at issue in the instant case.

## B.  The Instant Lawsuit

The Plaintiff in this case, Donna Chrastecky ("Plaintiff"), alleges that she suffered serious injuries after she was implanted with the Bard Align TO Urethral Support System device (the "Align Device") on October 22, 2010, by Dr. Ash Dabbous and Dr. Troy Haliparn at the Louis Pasteur Surgery Center in San Antonio, Texas. Plaintiff alleges that after the implantation, she began to suffer complications, including pain, rashes, irritation, infections, numbness, tingling, and the inability to void. Although Plaintiff has undergone multiple surgeries to remove the Align Device, she alleges that she continues to experience constant pain, infections, the inability to

2

maintain physical activity, depression, anxiety, and an inability to engage in intimate relations with her husband. On October 19, 2012, Plaintiff and her husband, Michael Chrastecky (together, "Plaintiffs"), filed this lawsuit directly into the Bard MDL, alleging negligence; strict liability design defect, manufacturing defect, and failure to warn; breach of express and implied warranties; and loss of consortium. *See* Dkt. Nos. 1 & 86-1. Plaintiffs seek compensatory and punitive damages, attorney fees, costs, interest, "or any other relief, monetary or equitable, to which they are entitled." Dkt. No. 86-1 at p. 34.

More than five years after Plaintiffs filed this case, the parties notified Judge Goodwin that they had reached a settlement. Dkt. No. 38. Accordingly, on October 27, 2017, Judge Goodwin ordered the case to be docketed as "inactive" and ordered the parties to file a joint motion to dismiss. *Id.* Ultimately, however, the parties were unable to reach a settlement. On February 4, 2019, Judge Goodwin returned the case to the active docket. Dkt. No. 42.

On December 3, 2019, Judge Goodwin transferred this case to the Western District of Texas "[f]or the convenience of the parties and in order to promote the final resolution of [this case]," reasoning that the case would be concluded more expeditiously in the venue "from which [it] arise[s]." Dkt. No. 102 at p. 1. The parties had notified Judge Goodwin that the proper venue for the case would be in this District. *Id.* The District Court referred this case to the undersigned on January 22, 2020. On January 31, 2020, the Court held a status conference, during which the parties informed the Court that all pending motions are ripe for disposition. Accordingly, the Court makes the following rulings on the instant Motions to Exclude.[2]

---

[2] A motion to exclude testimony is non-dispositive under 28 U.S.C. 636(b)(1)(A). *See Rollins v. Calderon*, 2019 WL 4544459, at *1 (S.D. Tex. May 13, 2019); *Masimo Corp. v. Philips Elec. N. Am. Corp.*, 62 F. Supp. 3d 368, 388 (D. Del. 2014) (stating that a *Daubert* motion to exclude testimony presents a non-dispositive matter).

## II.    LEGAL STANDARDS

### A.  Daubert

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993), the Supreme Court held that trial judges must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. Subsequent to *Daubert*, Rule 702 of the Federal Rules of Evidence was amended to provide that a witness

> qualified as an expert . . . may testify . . . in the form of an opinion . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Guy v. Crown Equipment Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (quoting Fed. R. Evid. 702). The Rule 702 and *Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

Under *Daubert*, expert testimony is admissible only if the proponent demonstrates that (1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). The overarching focus of a *Daubert* inquiry is the "validity and thus evidentiary relevance and reliability of the principles that underlie a proposed submission." *Watkins*, 121 F.3d 989 (quoting *Daubert*, 509 U.S. at 594-96). "The proponent of expert testimony bears the burden of establishing the reliability of the expert's testimony." *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016). Because the *Daubert* test focuses on the underlying theory on which the opinion is based, the proponent of expert testimony need not prove that the expert's testimony is correct, but rather that the testimony is reliable. *Moore*, 151 F.3d at 276. This determination of reliability includes a preliminary determination "whether the reasoning

or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

*Daubert* sets forth four specific factors that the trial court should ordinarily apply when considering the reliability of scientific evidence: (1) whether the technique can be or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether there is a known or potential rate of error; and (4) whether the relevant scientific community generally accepts the technique. *Id.* This test of reliability, however, is "flexible," and these factors "neither necessarily nor exclusively apply to all experts or in every case." *Kumho Tire*, 526 U.S. at 141. "Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142.

Notwithstanding the testing of an expert's qualification, reliability, and admissibility, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Adv. Comm. Notes (2000). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## B. Law of the Case Doctrine

Rulings made by a transferor court remain in effect in the transferee court. The transferee court respects those rulings under the "law of the case" doctrine, which embodies the general presumption that once an issue is decided in a case it should not be readily re-decided later in the case. 15 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3867 (4th ed. 2019). "The law of the case doctrine requires that courts not revisit the determinations of an earlier court unless (i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work . . . manifest injustice." *Id.* at

411-12 (quotations omitted); *see also Loumar, Inc. v. Smith*, 698 F.2d 759, 762 (5th Cir. 1983)

("The law of the case doctrine is closely related to the principle of res judicata. The latter prevents

collateral attack on the result of a completed lawsuit between the same parties; the former prevents

collateral attacks against the court's rulings during the pendency of a lawsuit."). Judge Goodwin

has made numerous pre-trial rulings in this case, including rulings on Bard's prior *Daubert* motions

to exclude, which this Court follows under the law of the case doctrine.

## III.    ANALYSIS

The Court addresses in turn each of Bard's four Motions to Exclude.

### A.  Bruce Rosenzweig, M.D.

Plaintiffs have designated Bruce Rosenzweig, M.D., as an expert medical witness who will

opine on the liability and causation issues in this case. Dr. Rosenzweig is designated to testify as

to Plaintiff's medical history and medical conditions; the implantation, use, and complications

arising from the use of the Align Device; the defects in the design, manufacture, and warnings of

the Align Device; and the causal relationship between the Align Device and the injuries of which

Plaintiffs complain in this case.

Dr. Rosenzweig is a urogynecologist and Attending Physician and Assistant Professor of

Obstetrics and Gynecology at Rush University Medical Center in Chicago, Illinois. In addition,

"Dr. Rosenzweig has performed over a thousand pelvic floor surgical procedures, and over 200

surgeries dealing with complications related to synthetic mesh." *In re Ethicon, Inc., Pelvic Repair

Sys. Prod. Liab. Litig.*, 2014 WL 186872, at *20 (S.D. W. Va. Jan. 15, 2014).

In his Expert Report, Dkt. No. 89-1 at p. 65, Dr. Rosenzweig opined:

> After reviewing her medical records and conducting my interview
> with the patient, I conclude that the Bard Align device is the cause
> of the symptoms Mrs. Chrastecky has endured and is currently still
> suffering. None of her other medical conditions were the cause of
> her symptoms. To a reasonable degree of medical certainty, there is

no other reasonable cause for her symptoms other than the Bard Align, given Mrs. Chrastecky's medical history.

In its motion, Bard does not dispute that Dr. Rosenzweig is a qualified expert. In fact, Judge Goodwin has previously ruled in the Bard MDL, and in a related MDL, that Dr. Rosenzweig is qualified to testify as to the general causation issues related to transvaginal mesh. *See Bard MDL*, 2018 WL 514753, at *3 (S.D. W. Va. Jan. 23, 2018) (holding that Dr. Rosenzweig is qualified to testify on the need for clinical trials and the adequacy of patient brochures); *In re Ethicon, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, 2014 WL 186872, at *20 (S.D. W. Va. Jan. 15, 2014) (concluding that "Dr. Rosenzweig is qualified to offer the opinion that the TVT is not suitable for permanent implantation to treat stress urinary incontinence"). Regardless, Bard argues that Dr. Rosenzweig's testimony regarding specific[3] causation as to Plaintiff is unreliable and should be stricken in its entirety because:

(1) his opinions are based on his general background and experience, rather than patient-specific testing;

(2) his opinions based on a broad differential diagnosis are unreliable;

(3) his claims that Plaintiff suffered injuries from mesh degradation, deformation, contracture/shrinkage, fraying, erosion/exposure, and migration are not based on any plaintiff-specific analysis;

(4) his opinion on the applicable standard of care for some of Plaintiff's treating providers is unreliable;

(5) his opinions regarding the sufficiency of the Align IFC are unreliable;

---

[3] Bard also argues that Dr. Rosenzweig's specific causation testimony should be stricken because his general causation testimony is unreliable, referring to its motion to exclude Dr. Rosenzweig's general causation testimony filed in the Bard MDL. *See* Dkt. No. 76 at p. 8. Because the motion to exclude Dr. Rosenzweig's testimony regarding general causation was filed in the Bard MDL case, this Court does not have jurisdiction to rule on that motion. *See* Bard MDL, 2018 WL 514753 (S.D. W. Va. Jan. 3, 2018). In addition, Bard previously was directed to file "general causation objections" in the main MDL by Judge Goodwin, who warned Bard that he would not rule on "general causation issues raised in a specific causation motion." *Priddy v. C. R. Bard, Inc.*, 2018 WL 662500, at *3 (S.D. W. Va. Feb. 1, 2018). Accordingly, under the law of the case doctrine, the Court will not address the general causation issues raised in the instant Motion.

(6) his opinion that there were safer alternative designs available is unreliable; and

(7) his opinion on future possible adverse events is unreliable and unsupported.

The Court addresses each of these arguments.

### 1. Lack of patient-specific testing as to Plaintiff

Bard argues that Dr. Rosenzweig's specific causation opinions about Plaintiff's alleged injuries "are based on nothing more than Dr. Rosenzweig's general background and experience, rather than patient-specific testing." Dkt. No. 76 at p. 10. Bard complains that "*none* of Dr. Rosenzweig's specific causation opinions about Ms. Chrastecky's Claimed Injuries are based on his testing of the Align TO device at issue, his examination or testing of explanted pathology materials, his review of micrographs, or his personal examination of Ms. Chrastecky or her symptoms and alleged conditions." *Id.* at p. 11.

In response, Plaintiffs emphasize that Dr. Rosenzweig's specific causation opinions were not based on his general background and experience alone, but were formulated after he reviewed "hundreds of pages of case-specific evidence and testimony" from Plaintiff's treating physicians and medical centers where she was treated. Dkt. No. 89 at p. 6 (citing Dkt. No. 89-1 at Exh. C). In addition, Plaintiffs point out that Dr. Rosenzweig reviewed scientific literature, corporate documents from Bard, sample products, and deposition transcripts of Bard employees and witnesses. Dkt. No. 89-1 at Exh. C. After performing an analysis of the facts and evidence in this case, Dr. Rosenzweig concluded that the Align Device was a direct and proximate cause of the symptoms suffered by Plaintiff and that none of her other medical conditions were the cause of her symptoms. Plaintiffs contend that in reaching his opinions, Dr. Rosenzweig applied his knowledge, skill, education, and experience as a urogynecologist to the facts of this case by performing a differential diagnosis, "ruling in" possible causes of Plaintiff's injuries, and "ruling out" the least likely causes.

The Court finds that Dr. Rosenzweig's Expert Report sufficiently explains his specific causation opinions as to Plaintiff's alleged injuries in this case, and finds that those opinions are supported by sufficient facts and data. *See* Dkt. No. 89-1 at 31-73. As Judge Goodwin held in Wave 5 of the Bard MDL, if Bard wishes to challenge the soundness of Dr. Rosenzweig's specific causation opinions, "it may do so by offering competing testimony or through cross-examination." *Corely-Davis v. C.R. Bard, Inc.*, 2018 WL 834944, at *2 (S.D. W. Va. Feb. 12, 2018) (denying Bard's lack of case-specific objections to Dr. Rosenzweig's expert report where Dr. Rosenzweig explained how he formulated those opinions and relied on sufficient facts and data). Accordingly, Bard's Motion to Exclude on this basis is **DENIED**.

### 2. Differential Diagnosis

Bard next argues that Dr. Rosenzweig's opinions based on his differential diagnosis are unreliable. Differential diagnosis is a "scientific technique that essentially involves the process of elimination." *Sims*, 893 F.3d at 401. As the Fifth Circuit has observed: "Many courts have found that a properly performed differential diagnosis can yield a reliable expert opinion." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 468 (5th Cir. 2012) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999)).

Dr. Rosenzweig explained his differential diagnosis as follows:

> After reviewing her medical records and conducting my interview with the patient, I conclude that the Bard Align device is the cause of the symptoms Mrs. Chrastecky has endured and is currently still suffering. None of her other medical conditions were the cause of her symptoms. To a reasonable degree of medical certainty, there is no other reasonable cause for her symptoms other than the Bard Align, given Mrs. Chrastecky's medical history.
>
> In performing a differential diagnosis, I have ruled out other conditions as causes of Mrs. Chrastecky['s] complaints and damages. Other attributing factors to her pain could be related to possible denervation from her prior hysterectomy; although she did not complain of muscle spasms, numbness, or pain until after the

mesh was implanted. A dislocated coccyx was also diagnosed after her implant which may have added to her symptoms, but would not cause dyspareunia. Although she did have a prior history of urge incontinence, incomplete emptying, and periodic UTI's; these issues were clearly exacerbated by her sling and subsequent procedures and revisions. Mrs. Chrastecky suffered from chronic vaginal, groin, pelvic, and perineal pain, tape kinking causing bladder outlet obstruction, mesh exposure, piriformis muscle tear causing pudendal neuropathy, vulvodynia, levator spasms, myalgia, recurrent SUI, urinary symptoms, and dyspareunia after her Align implant. Each of these injuries and related medical conditions were caused by the Align.

To a reasonable degree of medical certainty, the chronic foreign body reaction, cytotoxicity, migration, shrinkage, contraction, deformation, and degradation of the mesh constituted an unreasonably dangerous design defect, and the chronic foreign body reaction, cytotoxicity, migration, shrinkage, contraction, deformation, and degradation of the mesh caused Mrs. Chrastecky's injuries and medical complications.

Mrs. Chrastecky did not have, or subsequently develop, any medical or historical factors which increased her risk for developing chronic vaginal, groin, pelvic, and perineal pain, tape kinking causing bladder outlet obstruction, mesh exposure, pudendal neuropathy, vulvodynia, levator spasms, myalgia, recurrent SUI, urinary symptoms, and dyspareunia. Nor did she have, or subsequently develop, any medical or historical factors which increased her risk for developing these injuries after the Align was implanted.

While she did exhibit a history of cervical cancer, seasonal allergies, hypothyroid disease, hearing loss, osteopenia, vertigo, idiopathic thrombocytopenic purpura, back pain, neck pain, mixed incontinence, urgency, frequency and periodic UTI's, none of these factors were causative of her mesh related injuries and resulting medical conditions. None of her medical conditions were the cause of her symptoms. To a reasonable degree of medical certainty, there is no other reasonable cause for her symptoms other than the Align, given Mrs. Chrastecky's medical history.

Dkt. No. 89-1 at 65-67.

Bard argues that Dr. Rosenzweig's differential diagnosis is unreliable because it "fails to rule out all of Plaintiff's medical conditions as potential causes." Dkt No. 76 at p. 14. However, as Judge Goodwin stated in Wave 4 of the Bard MDL:

> [A]n expert's causation opinions will not be excluded because he or
> she has failed to rule out every possible alternative cause of a
> plaintiff's illness. Bard's suggested other possible alternative causes
> affect the weight—not the admissibility—of an expert's testimony,
> unless the expert can provide *no* explanation for ruling out such
> alternative causes at trial.

*Priddy v. C. R. Bard, Inc.*, 2018 WL 662500, at *2 (S.D. W.Va. Feb. 1, 2018) (quoting *Westberry,*
178 F.3d at 265). Accordingly, if Bard believes that Dr. Rosenzweig failed to consider other
alternative causes in his differential diagnosis analysis, Bard is free to address those issues through
cross-examination and competing testimony. *See id.* (denying Bard's Motion to Exclude
Dr. Rosenzweig's differential diagnosis). The Court finds that Dr. Rosenzweig considered
alternative causes for Plaintiff's injuries and adequately explained his reasons for ruling out those
alternative causes. Therefore, this objection is **DENIED**.

### 3. Injuries Attributed to Mesh Characteristics

Bard next argues that Dr. Rosenzweig's opinion that Plaintiff's injuries were caused from the
Align Device's mesh degradation, deformation, contracture/shrinkage, fraying, erosion/exposure,
migration, and the like are not based on any plaintiff-specific analysis, but rather are based on his
own general expert opinions in other cases. Judge Goodwin specifically rejected this argument in
*Priddy*:

> Bard also argues that Dr. Rosenzweig's specific causation opinions
> pertaining to the purported degradation, contraction, and
> deformation of the mesh product are unreliable because he did not
> personally examine the removed mesh, and there was no pathology
> report prepared after the explant. However, Dr. Rosenzweig
> explained during his deposition his reasons for inferring from the
> plaintiff's medical records the occurrence of degradation. If Bard
> wishes to challenge the soundness of this inference, it may do so by
> offering competing testimony or through cross-examination.

2018 WL 662500 at *2.

This Court similarly finds that Dr. Rosenzweig has explained the basis for his opinions regarding mesh degradation in his Expert Report. Accordingly, Bard's objection is **DENIED**.

### 4. Standard of Care

Bard argues that Dr. Rosenzweig's opinion that "Drs. Dabbous, Zimmern, Raz and Hibner's treatment of Mrs. Chrastecky met the standard of care" is unreliable because he has failed to demonstrate that he has knowledge of or understands the applicable standard of care in any relevant state outside of Illinois. Dkt. No. 76 at p. 16. Bard points out that Dr. Rosenzweig is licensed to practice medicine only in Illinois, and that none of Plaintiff's mesh-related treatment took place in Illinois. Thus, Bard argues: "Because Rosenzweig does not demonstrate that he has knowledge of or understands the applicable standard of care in any applicable state outside of Illinois, he is not qualified to offer this standard-of-care opinion, and it would be inherently speculative." Dkt. No. 76 at p. 16. Bard is mistaken.

Under Texas law, "[a] person is qualified to give opinion testimony concerning the causal relationship between the alleged injury and the alleged departure from the applicable standard of care only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence." *Harrington Schroeder*, 2015 WL 9001573, at *5 (Tex. App.—San Antonio 2015, pet. denied). However, "a physician need not be licensed to practice medicine in the state of Texas to be qualified to provide an expert opinion on causation in an expert report." *Id.* Texas law requires an expert witness only to be a physician who is "licensed to practice medicine in one or more states in the United States." Tex. Civ. Prac. & Rem. Code Ann. § 74.401(g)(1) (West 2011). Accordingly, Bard's argument that Dr. Rosenzweig is not qualified to testify as to Plaintiff's treating physician's standard of care because he is not licensed in Texas is without merit. *See Gonzalez v. Padilla*, 485 S.W.3d 236, 244 (Tex. App.—El Paso 2016, no pet.) (finding that physician licensed in Mississippi could testify as to standard of care for dressing

wounds in Texas); *Harrington*, 2015 WL 9001573, at \*5 (rejecting argument that physician was not qualified to testify as to causation because he was not licensed to practice medicine in the state of Texas and was licensed to practice medicine only in the state of California); *Kelly Ryan Cook, P.A. v. Spears*, 275 S.W.3d 577, 582–83 (Tex. App.—Dallas 2008, no pet.) (orthopedic surgeons, who were licensed to practice medicine in California and New Jersey and who stated in their expert reports that they were familiar with the standard of care in Texas, were qualified to opine on standard of care for physician assistant assisting in orthopedic surgery in Texas); *see also Nagle v. Gusman*, 2016 WL 9411377, at \*7 (E.D. La. Feb. 25, 2016) ("Whether an expert can reliably opine on a medical standard of care turns not on job titles but on the expert's education, experience, and other factors.").[4]

Accordingly, Bard's standard of care argument is **DENIED**. Again, Bard is free to bring up such issues on cross-examination.

### 5. Align Device IFU Warnings

Next, Bard argues that Dr. Rosenzweig is not qualified to testify as to the adequacy of the Align Device Instructions for Use ("IFU"). Because IFU opinions fall into the category of general causation opinions, the Court will not address this objection in the instant Motion. *See* n.3 *supra*. Regardless, as Plaintiffs point out, Judge Goodwin has rejected Bard's argument that Dr. Rosenzweig is unqualified to testify as to the IFU adequacy for vaginal mesh devices. *See* Bard MDL, 2018 WL 514753, at \*3 ("I therefore FIND that Dr. Rosenzweig is qualified to testify generally on the adequacy of the patient brochures produced by Bard."); *see also Huskey v.*

---

[4] Bard cites Judge Goodwin's opinion in the Bard MDL, 2018 WL 4220618, at \*3 (S.D. W. Va. Sept. 5, 2018), for the proposition that out-of-state physicians are not qualified to testify as to in-state standards of care. Bard's reliance on this opinion is misplaced. Judge Goodwin did not exclude the expert witness's testimony as to standard of care because he was licensed in another state; rather, the court excluded the testimony based on the expert witness's "own admission that he is unable to make any judgments as to whether the plaintiffs' treating physicians breached the applicable standard of care." *Id.*

*Ethicon, Inc.*, 29 F. Supp. 3d 691, 704 (S.D. W.Va. 2014) ("I therefore FIND that Dr. Rosenzweig is qualified to testify generally on the adequacy of the TVT-O's product warnings and marketing materials."). Accordingly, this objection is **DENIED**.

### 6.  Safer Alternative Designs

Next, Bard argues that Dr. Rosenzweig's opinion that safer alternative designs were available is unreliable. Again, this a general causation objection, and Bard has been warned by Judge Goodwin not to raise general causation issues in a specific causation motion. *See Priddy*, 2018 WL 662500, at *3. In addition, Judge Goodwin has rejected this argument. *See Corely-Davis*, 2018 WL 834944, at *3. Accordingly, this objection is **DENIED**.

### 7.  Future Medical Care

Bard argues Dr. Rosenzweig's opinion that Plaintiff will have ongoing and future complications from the Align Device is speculative, unreliable, and contradicted by his own testimony. The Court finds that Dr. Rosenzweig is qualified to testify as to his opinion of Plaintiff's future medical complications from the Align Device. As noted, Dr. Rosenzweig reviewed Plaintiff's medical history, records, and subjective complaints, and based on his training, education, knowledge, experience, and skill, he is qualified to testify as to his opinion of Plaintiff's future medical complications from the Align Device. This objection is **DENIED**.

### 8.  Scope of Testimony

Finally, Bard argues that Dr. Rosenzweig should be precluded from opining on and testifying to topics that were not disclosed in his Expert Report. Under Rule 26, expert reports must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Therefore, an expert's testimony generally is limited to his or her report produced in accordance with Rule 26(a)(2)(B), and to explanations "that are a reasonable extension of his report." *Bates & Co., Inc. v. Hosokawa Micron Int'l, Inc.*, 2005 WL 6227845, *1

(E.D. Tex. April 4, 2005). Accordingly, Dr. Rosenzweig's testimony at trial should be limited to his opinions and statements in his report and any explanations that are reasonably necessary to explain the opinions in his report.

### 9. Conclusion

Based on the foregoing, Bard's Motion to Exclude Dr. Bruce Rosenzweig's Testimony (Dkt. No. 75) is **DENIED**. Bard is correct, however, that Dr. Rosenzweig's testimony at trial should be limited to his opinions and statements in his report, and any explanations that are reasonably necessary to explain those opinions.

## C. Ahmed El-Ghannam, Ph.D.

Plaintiffs have designated Ahmed El-Ghannam, Ph.D. ("Dr. Ghannam") as a general and specific expert in the field of biomaterials and bioengineering who will testify that Bard's medical devices, including the Align Device implanted in Plaintiff, are defective in their design and manufacture, and unsuitable for use as a biomaterial. Dr. Ghannam received his Ph.D. in Bioengineering from the University of Pennsylvania in December 1995. From 2007 to the present, he has been employed by the University of North Carolina at Charlotte as an Associate Professor in the Department of Mechanical Engineering. In his Expert Report (Dkt. No. 81-3 at p. 46), Dr. El-Ghannam opines, in relevant part, the following:

> Based on my review and analysis of the failed mesh, literature, and more than one-hundred explants that I have examined and based on my extensive background and experience, it is my opinion to a reasonable degree of scientific certainty that the Bard mesh implanted in Ms. Donna Chrastecky is not biocompatible and did not integrate with tissue nor augment it. It is my opinion with reasonable scientific certainty that mesh implanted in Ms. Donna Chrastecky, degraded in the body and she would have suffered a heightened inflammatory response and mesh erosion as a result of the degradation of the mesh products implanted in her body. It is also my opinion with reasonable scientific certainty that the mesh is defectively designed as the pores did not facilitate integration.

Bard argues that some of Dr. El-Ghannam's opinions and testimony should be excluded because his opinions "exceed the scope of his skill, experience, training, knowledge, education, and expertise." Dkt. No. 82 at p. 7. Specifically, Bard argues that:

(1) Dr. El-Ghannam is not qualified to testify regarding causation;

(2) Dr. Ghannam's specific causation opinions should be excluded because they are based on his improper general opinions, are the product of a logical fallacy, and were not the product of any differential diagnosis;

(3) his design opinions should be excluded because he lacks the specialized knowledge, skill, experience, training and education necessary to offer opinions regarding polypropylene of its degradation;

(4) Dr. Ghannam's FTIR and SEM testing is unreliable because he lacks the qualifications to perform such tests; and

(5) he lacks the necessary qualifications to provide opinions on manufacturing stresses and mesh testing.

As explained below, Judge Goodwin has already rejected the majority of Bard's arguments regarding Dr. Ghannam in the Bard MDL.

## 1. Dr. El-Ghannam's Qualifications

Bard first argues that Dr. El-Ghannam is not qualified to testify regarding causation in this case because he lacks a medical degree or the necessary clinical experience in pathology to form such opinions. Judge Goodwin has already addressed and rejected this argument, reasoning as follows:

> Dr. El-Ghannam is certainly qualified in the field of biomaterials and biomedical engineering—he is educated and his professional experience has focused in this field. In moving to exclude, Bard fails identify any particular opinion advanced by Dr. El-Ghannam that speaks to the issue of general causation outside the scope of his expertise. Instead, Bard relies upon its conclusory assertion that without a medical education or background Dr. El-Ghannam is not "qualified to draw any connection between polypropylene degradation and any alleged injury to a particular plaintiff." I disagree, Dr. El-Ghannam's experience and review of the scientific literature adequately qualify him to opine on polypropylene, including its purported degradation and the resulting inflammatory response.

***

> Dr. El-Ghannam is well-qualified in the field of biomaterials and biomedical engineering to testify regarding the interaction between implanted medical devices and, more specifically, the mechanisms and biologic effects of degradation of polypropylene.

Bard MDL, 2018 WL 514879, at *3 (S.D. W. Va. Jan. 23, 2018).

Even if Judge Goodwin had not already rejected Bard's qualification argument, it would nevertheless fail because an expert's lack of specialization goes to the weight of the testimony, not its admissibility. *See Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) ("Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."); *Hill v. Universal Am-Can, Ltd.*, 2007 WL 4530866, at *3 (E.D. Tex. Sept. 4, 2007) (noting that "a lack of specialization does not affect the admissibility of the testimony, but rather, the weight to be given that testimony"). Accordingly, Bard's objection is without merit.

## 2. Specific Causation

Bard next argues that Dr. Ghannam's specific causation opinions that Plaintiff suffered injuries due to mesh degradation should be excluded because there is no foundation to support his conclusory statements. Bard contends that because Dr. Ghannam never examined Plaintiff, he could not testify that she had suffered any injuries as a result of the mesh. Bard also points out that Dr. Ghannam never read Plaintiff's deposition and did not review all of Plaintiff's medical records in detail.

Bard ignores the fact that Plaintiffs retained Dr. El-Ghannam not as a medical expert, but as a biomedical and bioengineering expert to opine regarding the interaction between Plaintiff's mesh implant and her body. Bard also fails to mention that Dr. El-Ghannam actually examined and analyzed the mesh at issue before forming his opinions: "I removed the tissue around the failed implant taken from [Plaintiff] and analyzed the mesh samples using scanning electron microscopy

17

('SEM'), Fourier transform infrared spectroscopy ('FTIR') and Differential Scanning Calorimetry ('DSC')." Dkt. No. 90-7 at p. 5. On examination, Plaintiff's tissue showed signs of degradation and migration.

Dr. El-Ghannam testified that according to his experience analyzing hundreds of Bard mesh devices, as well as his reading of pertinent medical literature, degrading mesh migrates from the implantation site into other areas of the body and other organs. *See* Dkt. No. 90-11 at p. 38-39. He found that Plaintiff's tissue contained degraded mesh particles that had migrated from the mesh into the surrounding tissue. *Id.* at p. 134-135. He noted that the literature is "full of data" confirming the migration of mesh particles into other parts of the body, and opined that due to his observations and analysis, Plaintiff experienced the same complications. *Id.* at 38-39.

The Court finds that Dr. El-Ghannam has established an adequate foundation for his testimony. The Court further finds that Bard's criticisms of Dr. El-Ghannam's specific causation opinions go to the weight of his testimony, not to its admissibility. *See Fair v. Allen*, 669 F.3d 601, 607 (5th Cir. 2012) ("[T]he basis of an expert's opinion usually goes to the weight, not the admissibility, of the testimony."); *Priddy*, 2018 WL 662500, at *2 (finding that Bard's suggested other possible alternative causes affect the weight, not the admissibility of the expert's testimony).

### 3. Design Defects

Next, Bard argues that Dr. El-Ghannam's design defect opinions should be excluded because he lacks the specialized knowledge, skill, experience, training, and education necessary to offer opinions regarding polypropylene or its degradation. Judge Goodwin rejected this argument in the Bard MDL in 2013, reasoning:

> I have some concerns about Dr. El-Ghannam's qualifications to testify specifically as to the properties of polypropylene. However, in sum, Dr. El-Ghannam has extensive education and experience in biomaterials generally—which include polymers—and particularly as it relates to materials implanted in the human body. Accordingly,

> I FIND that Dr. El-Ghannam has demonstrated sufficient knowledge
> of the area of polypropylene to qualify him to offer opinions on
> design defects.

Bard MDL, 948 F. Supp. 2d 589, 633 (S.D. W. Va. 2013). Again in 2018, Judge Goodwin found

that "Dr. El-Ghannam has demonstrated sufficient knowledge of the area of polypropylene to

qualify him to offer opinions on design defects." Bard MDL, 2018 WL 514879, at *3. Judge

Goodwin also rejected Bard's argument that Dr. El-Ghannam reached his design defect opinion

by virtue of an unreliable methodology, finding that his testing methodology "is sufficiently

reliable for his design defect opinion to withstand a *Daubert* challenge." *Id.* at *4. As Judge

Goodwin found, Bard's objections to Dr. El-Ghannam's opinions as to design defects are more

properly raised at trial during cross-examination. *Id.*

### 4. FTIR and SEM Testing

Bard next argues that Dr. Ghannam's FTIR and SEM testing are unreliable because he lacks

the qualifications to perform such tests. Once again, Bard is attempting to raise an argument

already rejected in the underlying MDL. Judge Goodwin has already determined that "Dr. El-

Ghannam has demonstrated sufficient knowledge of the area of FTIR and SEM testing of

biomaterials to qualify him to opine on findings derived from FTIR and SEM tests on polymers."

Bard MDL, 2018 WL 514879, at *4. In addition, Judge Goodwin concluded that "Dr. El-

Ghannam's FTIR and SEM testing methodology is sufficiently reliable to pass a *Daubert*

challenge." *Id.*; *see also* Bard MDL, 948 F. Supp. 2d at 633-35 (same). Accordingly, Bard's

arguments are without merit.

### 5. Manufacturing Stresses

Last, Bard argues that Dr. El-Ghannam lacks the necessary qualifications to provide opinions

on manufacturing stresses and mesh testing. According to Bard, Dr. El-Ghannam criticizes the

manufacturing process of the mesh products, claiming that Bard improperly subjects the products

to mechanical stresses during knitting and heat setting. Bard argues that Dr. El-Ghannam is not qualified to render an expert opinion on these topics because he is not a textile engineer and did not review the necessary documents to understand the manufacturing process. Thus, Bard contends, Dr. El-Ghannam's opinions regarding the manufacturing defects of the knitted mesh should be excluded. Bard also challenges the reliability of Dr. El-Ghannam's opinion that "increased stiffness of the polypropylene fibers is a degradation mark." Dkt. No. 82 at p. 20.

Again, Judge Goodwin ruled on these precise arguments in the Bard MDL, holding that "Dr. El-Ghannam may opine on the manufacturing process as it relates to temperature, but not as it relates to the knitting process of the mesh." Bard MDL, 2018 WL 514879, at *5. In addition, Judge Goodwin held that "Dr. El-Ghannam may opine on whether increased stiffness of the polypropylene fibers is a degradation mark." *Id.* Accordingly, the Court **DENIES** Bard's objections to Dr. El-Ghannam's testimony except with regard to his opinions regarding Bard's alleged manufacturing defects of the knitting process of the mesh.

### 6. Conclusion

In summary, the Court **GRANTS IN PART AND DENIES IN PART** Bard's Motion to Exclude or Limit Certain Opinions and Testimony of Ahmed El-Ghannam, Ph.D. (Dkt. No. 81). The Court **GRANTS** the Motion to Exclude Bard's objections to Dr. El-Ghannam's opinions and testimony regarding Bard's alleged manufacturing defects of the knitting process of the mesh. The Court **DENIES** the Motion to Exclude as to all other objections.

### D. Joe Gonzales, M.D.

Plaintiffs have designated Dr. Joe Gonzales, M.D., as an expert medical witness to provide opinions regarding Plaintiff's future medical care. Dr. Gonzales is a Physical Medicine and Rehabilitation, Pain Medicine, and Occupational and Environmental Medicine specialist who has practiced medicine in Texas since 1985. Dr. Gonzales is a licensed physician in Texas, and is board

certified by the American Academy of Physical Medicine and Rehabilitation, the American Board of Pain Medicine, and the American College of Occupational and Environmental Medicine. Dr. Gonzales opines in his Expert Report that "the total value of Plaintiff's future medical requirements as formulated in this life care plan,[5] and which pertain to her relevant diagnostic conditions and disabilities = $721,277.76.1" Dkt. No. 92-1 at p. 1.

Bard argues that Dr. Gonzales's opinions and testimony should be excluded because (1) he is not qualified to render an opinion that the Align Device caused Plaintiff's alleged medical issues; (2) his opinions regarding future medical requirements of Plaintiff are based on assumptions not supported by the factual record; and (3) his opinions regarding additional surgeries to remove the mesh are unsupported by the record and unreliable.

### 1. Causation Opinions

Dr. Gonzales opines in his Expert Report that Plaintiff's future medical requirements are "specifically attributable to the medical conditions which resulted from Mrs. Chrastecky's complications associated with the surgical implanted mesh product, which is reported to have occurred on October 22, 2010." *Id.* at p. 5. Bard argues that Dr. Gonzales is not qualified to render an opinion that attributes Plaintiff's alleged injuries to the Align Device. The Court agrees.

As noted above, Plaintiffs designated Dr. Gonzales to provide opinions and to testify as to Plaintiff's future medical care, not regarding causation. Dr. Gonzales is a Physical Medicine and Rehabilitation, Pain Medicine, and Occupational and Environmental Medicine specialist, but there is no evidence that he has specialized training or knowledge in the implantation or removal of

---

[5] "Life care plans are comprehensive documents that objectively identify the residual medical conditions and ongoing care requirements of ill/injured individuals, and they quantify the costs of supplying these individuals with requisite, medically-related goods and services throughout probable durations of care. The content and structure of a life care plan, and the methods used to produce it, are based upon comprehensive assessments, interviews and/or examinations, research and analysis, and published methodologies and standards of practice." Dkt. No. 92-1 at p. 2.

vaginal mesh. He is not board certified in gynecology, urology, urogynecology, or any surgical specialty. Plaintiffs have failed to demonstrate that Dr. Gonzales has the knowledge, skill, experience, training or education that would permit him to opine that the Align Device caused Plaintiff's medical issues. Although Dr. Gonzales is qualified to give testimony regarding Plaintiff's future medical care, he is not qualified to testify that the Align Device caused Plaintiff's medical issues.

### 2. Opinions Regarding Plaintiff's Future Medical Requirements

Next, Bard argues that Dr. Gonzales's opinions regarding Plaintiff's future medical requirements are unreliable and not supported by the factual record because (1) he never personally examined Plaintiff; (2) he admitted during his deposition that he didn't know the current condition of the Plaintiff as of the date of the deposition; and (3) his opinion that Plaintiff would need additional surgeries is not supported in the record. The Court disagrees.

As Dr. Gonzales states in his Expert Report: "I formulated Mrs. Chrastecky's future medical requirements based upon my education, training and professional experience as a practicing physician, Board Certified Physical Medicine & Rehabilitation Specialist, Board Certified Pain Management Specialist, Board Certified Occupational and Environmental Medicine Specialist, Certified Life Care Planner and Certified Physician Life Care Planner." *Id.* at p. 130. In addition, Dr. Gonzales avers in his report:

> I have employed a reasonable degree of medical probability as a primary criterion in the formulation of my medical recommendations, and I have made such recommendations with the intent of accomplishing the following Clinical Objectives of Life Care Planning:
>
> 1. Diminish or eliminate Mrs. Chrastecky's physical and psychological pain and suffering.
>
> 2. Reach and maintain the highest level of function given Mrs. Chrastecky's unique circumstances.

3. Prevent complications to which Mrs. Chrastecky's unique physical and mental conditions predispose her.

4. Afford Mrs. Chrastecky the best possible quality of life in light of her condition.

*Id.*

In addition, Dr. Gonzales explains that he formed opinions regarding Plaintiff's future medical care after reviewing all of her medical records and providing a 114-page detailed summary of those medical records in his report. *Id.* at p. 6-121. While Dr. Gonzales did not perform a physical examination of Plaintiff, he did perform an in-depth of interview of Plaintiff "for the purpose of determining her diagnostic conditions and consequent circumstances." *Id.* at p. 121. In addition, he testified in his deposition that he also spoke to Plaintiff's treating surgeon, Dr. Phillipe Zimmern, a urologist, regarding her need for future medical care. Dkt. No. 92-2 at p. 15-16 (53:7-25, 57:18-25). Based on the foregoing, the Court finds that there was an adequate basis for Dr. Gonzales's opinions regarding Plaintiff's future medical care.

While Bard makes much of the fact that Dr. Gonzales did not perform a physical examination of Plaintiff, Bard ignores the fact that Dr. Gonzales did interview her. In addition, as Dr. Gonzales testified in his deposition, a physical examination of Plaintiff was not necessary in this case because: "That's not someone that I would've put up in stirrups and examined. I would have relied on her treating physician's findings more so because of the nature of her injury. Most of the people that I see are not people with . . . vaginal injuries." Dkt. No. 92-2 at p. 43.

Bard also argues that Dr. Gonzales's Expert Report should be excluded because "he admitted that he didn't know the current condition of the Plaintiff as of the date of his deposition which occurred about two months after his report was generated." Dkt. No. 78 at p. 10. In addition, Bard complains that Dr. Gonzales's Expert Report is unreliable because it includes medications that Plaintiff is no longer taking. However, Dr. Gonzales was retained as an expert to provide testimony

about Plaintiff's future medical care, not her past or current medical care. Any changes in her medical condition after the Expert Report was generated does not mean that the entire report is unreliable. Such objections go to the weight and not the admissibility of the Expert Report. *See Fair v. Allen*, 669 F.3d 601, 607 (5th Cir. 2012) ("[T]he basis of an expert's opinion usually goes to the weight, not the admissibility, of the testimony.").

Bard also argues that Dr. Gonzales's opinion that Plaintiff would need additional surgeries in the future to remove the mesh is unsupported by the record. Bard complains that Dr. Gonzales's "sole basis" for opining that Plaintiff would need additional surgeries to remove the mesh was based on a conversation he had with Dr. Zimmern. Dkt. No. 78 at p. 8. Dr. Gonzales explained in his deposition that his opinion that Plaintiff would need additional surgeries was based on the Plaintiff's treating physicians' opinions that she would need additional surgeries, and in particular Dr. Zimmern's opinion "that [Dr. Zimmern] did not believe that it was possible to totally remove all material, that it would have to be done periodically as symptoms and problems arose, and that I should account for periodic excisions of the material." Dkt. 92-2 at p. 57. Dr. Zimmern, Plaintiff's treating urologist, specializes in pelvic floor surgeries, such as reconstructive surgeries and mesh removals. Dkt. No. 92-4 at p.16-17. The Court finds that Dr. Gonzales properly relied on the medical records and Plaintiff's treating physician's findings in forming his opinion. Again, Bard's objections go to the weight, and not the admissibility, of the Expert Report.

### 3. Conclusion

Based on the foregoing, Bard's Motion to Exclude of Limit the Opinions and Testimony of Joe Gonzales is **GRANTED IN PART AND DENIED IN PART** (Dkt. No. 77). The Court **GRANTS** the Motion to Exclude Dr. Gonzales from testifying that the Align Device caused Plaintiff's medical issues, but **DENIES** the Motion to Exclude on all other grounds.

### E. Kenneth McCoin, Ph.D.

Plaintiffs have retained Dr. Kenneth G. McCoin, Ph.D., an economist, to testify regarding Plaintiff's past and future damages and present value calculations associated with Plaintiff's future medical expenses. In his Expert Report, Dr. McCoin prepared an appraisal of Plaintiff's earning capacity and found that she last worked as a vice-president of administration in 2010 and earned a salary of $196,798. Dkt No. 79-2 at p. 2. Dr. McCoin predicted that Plaintiff's 2019 earnings would be $242,806. *Id.* He opined that the "present-day value of Mrs. Chrastecky's earning capacity is $3,651,132 of which $1,759,163 [is] apportioned to the past, and the remainder of $1,891,969 is apportioned to the future." *Id.* at p. 3.

Bard argues that Dr. McCoin's opinions and testimony should be excluded because he is not qualified to render any opinions regarding Plaintiff's past and future earning capacity. Alternatively, Bard argues that Dr. McCoin's opinions and testimony regarding loss of earning capacity is unsupported and unreliable. Bard also argues that Dr. McCoin should be excluded from testifying regarding opinions that have been withdrawn or for which he was unable to provide testimony about at his deposition.

#### 1. Qualifications

Bard first argues that Dr. McCoin is not qualified to render any opinions regarding Plaintiff's past and future earning capacity. Bard points out that Dr. McCoin's curriculum vitae shows only "that he is trained in the fields of finance and business," and that his professional experience "primarily consists of being president of an investment advisor and then a private equity . . . broker/dealer." Dkt. No. 80 at p. 10. Bard contends that: "Nothing in his resume or testimony establishes that he has specialized 'knowledge, skill, experience, training, or education' with respect to calculating lost earning capacity. As a result, he is not qualified to render opinions concerning Plaintiff's alleged lost earning capacity or the present value of same." *Id.*

In response, Plaintiffs point out that Dr. McCoin earned his Ph.D. in economics from the University of Houston in 1974 and has "worked as a professional economist and financial analyist for nearly 50 years, has published numerous papers, [and] has served as an adjunct professor and lecturer at the University of Houston, Houston Baptist University, and Rice University." Dkt. No. 91 at p. 4. Thus, Plaintiffs argue, "[t]here can be no doubt that Dr. McCoin is qualified to testify regarding the financial impact of the injury suffered by Plaintiff in this case." *Id.*

Bard failed to respond to Plaintiff's arguments in its Reply and apparently has abandoned its lack of qualification argument. Even if it had not, Bard's argument would fail because an expert's lack of specialization goes to the weight of the testimony, not its admissibility. *See Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) ("Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."); *Hill v. Universal Am-Can, Ltd.*, 2007 WL 4530866, at *3 (E.D. Tex. Sept. 4, 2007) (noting that "a lack of specialization does not affect the admissibility of the testimony, but rather, the weight to be given that testimony"). Accordingly, Bard's objection to Dr. McCoin's qualifications is **DENIED**.

## 2. Reliability

Bard next argues that Dr. McCoin's opinions and testimony regarding loss of earning capacity are unsupported and unreliable because (1) they are based on assumptions that are not supported by the factual record; (2) Dr. McCoin erroneously assumed that Plaintiff would have continued to work as a vice-president after the company she owned with her husband was sold in 2017; (3) his opinion as to the real rate of interest or discount rate he applies in unreliable; (4) his opinions regarding Plaintiff's past and future benefits are unreliable; and (5) he has failed to consider the impact of income taxes for his opinions.

All of these objections go to the weight of Dr. McCoin's testimony, not to its admissibility. Bard is free to bring up all of these arguments during cross-examination. As the Supreme Court

stated in *Daubert*: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### 3. Scope of Testimony

Finally, Bard argues that Dr. McCoin should be excluded from testifying regarding opinions that have been withdrawn or for which he was unable to provide testimony at his deposition. Under Rule 26, expert reports must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Therefore, an expert's testimony generally is limited to his or her report produced in accordance with Rule 26(a)(2)(B) and to explanations "that are a reasonable extension of his report." *Bates & Co., Inc. v. Hosokawa Micron Int'l, Inc.*, 2005 WL 6227845, *1 (E.D. Tex. April 4, 2005). Accordingly, Dr. McCoin's testimony at trial should be limited to his opinions and statements in his report and any explanations that are reasonably necessary to explain the opinions in his report.

### 4. Conclusion

In summary, the Court **DENIES** Bard's Motion to Exclude or Limit Certain Opinions and Testimony of Kenneth McCoin, Ph.D. (Dkt. No. 79). However, Bard is correct that Dr. McCoin's testimony at trial should be limited to his opinions and statements in his report and any explanations that are reasonably necessary to explain the opinions in his report.

**SIGNED** on February 14, 2020.

SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE